**Wayne F. LINHART, Plaintiff,**

v.

**Edward GLATFELTER, individually and as Village Manager of the Village of Clarendon Hills, and The Village of Clarendon Hills, a Municipal Corporation, Defendants.**

**No. 83 C 1292.**

United States District Court, N.D. Illinois, E.D.

March 30, 1984.

---

Terry A. Ekl, Stephen Connolly, Connolly & Ekl, P.C., Chicago, Ill., for plaintiff.

Gerald J. Brooks, Heidi H. Katz, Fawell, James & Brooks, Naperville, Ill., for defendant.

## MEMORANDUM OPINION

KOCORAS, District Judge:

Despite the prescient warnings of some of its members,[1] the Forty-second Congress

---

1. It is doubtful that anyone living in the more temperate times of a century ago—before the nation had more than half a million lawyers and it became the vogue to run to a court of law with virtually every grievance, no matter how inconsequential—truly could have imagined the long-range consequences of the sweeping language employed in the Ku Klux Klan Act. But certain members of Congress had at least a glimmering of the enormous potential for abuse that was lurking in the words of the bill that eventually became the law. Senator Thurman of Ohio, for instance, summarized one of the features that has now made the statute so popu-lar among those with a litigious bent of mind when he said:

> The deprivation [the plaintiff need suffer to have a cause of action] may be of the slightest conceivable character, the damages in the estimation of any sensible man may not be five dollars or even five cents; they may be what lawyers call merely nominal damages; and yet by this section jurisdiction of that civil action is given to the Federal courts instead of its being prosecuted as now in the courts of the States. `

Cong. Globe, 42d Cong., 1st Sess. app. 216 (1871).

scarcely could have realized when it enacted section 1 of the Ku Klux Klan Act of April 20, 1871, 17 Stat. 13, (now codified at 42 U.S.C. § 1983), that the law it passed to curtail the outrages perpetrated by the Klan in the Reconstruction-era South actually would be used a century later to transform the federal courts into the favorite forum of litigious individuals intent on prosecuting such trivial causes, for example, as those of a high school student whose grade average was reduced from 95.478 to 95.413,[2] or a pet owner whose dog was locked in the pound for several hours by the local dogcatcher.[3] Such corruption of this important civil rights statute has become all too common in recent years as plaintiffs and their lawyers have striven to transform every manner of petty grievance against local officials into a federal case.[4]

Speaking in opposition to the bill, Mr. Kerr of Indiana predicted abuses of the statute that may have seemed far-fetched to his nineteenth-century colleagues but that are now a commonplace of section 1983 litigation:

> [The statute] may give rise to numerous vexations and outrageous prosecutions, inspired by mere mercenary considerations, prosecuted in a spirit of plunder, aided by the crimes of perjury and subornation of perjury, more reckless and dangerous to society than the alleged offenses out of which the cause of action may have arisen.

*Id.* at 50.

2. *Raymon v. Alvord Independent School District,* 639 F.2d 257 (5th Cir.1981). High school students, who cannot be expected to know better; their parents, who should know better; and the parents' lawyers, who must know better, often use section 1983 as a vehicle for bringing minor disputes with school officials into federal court. Another example of such abuse is the case of *Bernstein v. Menard,* 557 F.Supp. 90 (E.D.Va. 1982) (granting motion to dismiss), 557 F.Supp. 92 (E.D.Va.1983) (awarding defendants attorneys' fees), *aff'd,* 728 F.2d 252 (4th Cir.1984), in which the mother of a high school boy brought a federal civil rights action on his behalf after he was dismissed from the school band. In dismissing the case the district court commented on the pernicious effects of such irresponsible litigation as follows:

> This complaint is another example of a prevalent disposition by parties and lawyers to litigate over every source of unhappiness to which humankind may be subject. While it might be considered unfortunate that a boy be dismissed from the high school band, it is much more unfortunate that his mother saw fit to take the matter to court and that she was able to find a lawyer willing to do her bidding.
> ....
> ... While all of us, including schoolchildren, have rights under the United States Constitution, the Constitution is not a god watching over us, counting the hairs on our head, or concerned when a sparrow falls from the heavens....
> Indeed, if courts seriously entertain suits such as this, not only will the courts fall into disrepute, but much more gravely, the Constitution will become the subject of derision. It is a serious mistake to treat the Constitution as a brooding presence, ever present in time of need, able to right any wrong, correct any evil, set straight that which has gone awry, feed the hungry, and clothe the naked. The Constitution is a law. It provides the framework of our government and sets forth certain restrictions upon the government's ability to interfere with fundamental rights of free men and women. Suits such as this trivialize our Constitution.

557 F.Supp. at 91 (footnote omitted). *See also Price v. Young,* 580 F.Supp. 1 (E.D.Ark.1983) (dismissing a section 1983 action brought by a father against eight school officials because his son was not selected for membership in the National Honor Society).

3. *Kostiuk v. Town of Riverhead,* 570 F.Supp. 603 (E.D.N.Y.1983).

4. *See, e.g., Renfroe v. Kirkpatrick,* 549 F.Supp. 1368 (N.D.Ala.1982), *aff'd,* 722 F.2d 714 (11th Cir.1984), in which the court said, "There is empirical evidence that parties quite often attempt to unduly stretch established constitutionally protected interests," and added in a footnote that "[s]uch claims tend to dilute public regard for even legitimate claims. Perversions of the Constitution, like violations of the Constitution, should not be tolerated." 549 F.Supp. at 1370–71 & n. 5.

A case recently decided by Judge Dumbauld of the Western District of Pennsylvania is illustrative of the disturbing trend among some plaintiffs to use the civil rights laws for purposes that make a mockery of their legitimate objective of securing fundamental rights. In his opinion, the judge described the action in the following terms: "Plaintiff, one John G. Arch, a member of the Allegheny County Bar, seeks in this litigation to transform a squabble over attorneys' fees into a 'federal case' of constitutional dimension." *Arch v. Papadakos,* 575 F.Supp. 1271, 1272 (W.D.Pa.1984). In another recent case under section 1983, a plaintiff who was described as "a well respected attorney in his own right," unsuccessfully sought to embroil a federal court in a divorce case that his wife had filed against him in state court. *Williams v.*

The statute has been further debased of late as hordes of public employees, from schoolteachers to police chiefs, have realized that it can be manipulated to provide an expedient means of challenging every conceivable type of adverse personnel action. In contrast to employees in the private sector, public employees can haul their employers into federal court with comparative ease under section 1983 since even the most mundane personnel decision can satisfy the state action requirement of the statute. Faced with the intimidating prospect of costly federal litigation, including what one respected commentator has called "the swamp of discovery," [5] and the specter of paying for the plaintiff's lawyer under section 1988 should they lose the case, public employers are often persuaded to capitulate. It seems clear that the postbellum Congress that enacted the statute in response to President Grant's call for legislation to combat the lawless conditions then existing in the South never intended to create a law by which the employees of every hamlet and village in the nation could bring a federal lawsuit over routine person-nel decisions. Nevertheless, Congress cast the statute in general language of broad applicability which the courts are not free to rewrite, and as Judge Posner recently observed, suits of this nature "have become an important part of the business of the federal courts." *Brown v. Brienen,* 722 F.2d 360, 362 (7th Cir.1983).

This is such a case. The former acting chief of police of a small village outside Chicago thinks his constitutional rights were violated when the village manager placed a letter of reprimand in his personnel file. Accordingly, he has filed this federal lawsuit, claiming (surely with tongue in cheek) that he has sustained a million dollars in damages. Two of the plaintiff's claims managed to survive the defendants' motion to dismiss, and now that discovery has been completed those claims are back before the court on the parties' cross-motions for summary judgment.

## I.

As with many of these cases, this one requires a federal court to venture deep

---

*Birzon,* 576 F.Supp. 577 (W.D.N.Y.1983). Nowadays, it is not unusual to find several cases such as these merely by flipping through any issue of the advance sheets.

The seemingly limitless possibilities for abusive lawsuits under the statute have not been lost on the denizens of the nation's prisons. They have embraced section 1983 as the primary means through which they indulge their insatiable passion for recreational litigation against their jailers. *See McKeever v. Israel,* 689 F.2d 1315, 1325 (7th Cir.1982) (Posner, J., dissenting). For many inmates "continuous, mostly frivolous, pro se, *in forma pauperis* litigation can only be called a form of jail house hobby." *Dankert v. Clerk, Superior Court, Cobb County,* 86 F.R.D. 474, 475 (N.D.Ga.1980). One habitual criminal who has spent the past several years locked up in penitentiaries around the country has adopted litigation, most of it prosecuted in the federal courts under section 1983, as his "religion." *See Green v. Warden, U.S. Penitentiary,* 699 F.2d 364 (7th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983). A partial listing of the hundreds of lawsuits filed by this prisoner as of 1979 takes up nine pages in the *Federal Supplement. Green v. Camper,* 477 F.Supp. 758, 759–768 (W.D.Mo. 1979). *See also Franklin v. State of Oregon,* 563 F.Supp. 1310, 1311, 1316 (D.Or.1983) (disposing of 64 lawsuits filed by a prisoner who the court said "has taken it upon himself to bedevil his keepers and, indirectly, this court"); *Franklin v. State of Oregon,* 575 F.Supp. 1485, 1487 (D.Or. 1983) (disposing of sundry matters subsequently filed by the same prisoner, including one lawsuit against the manager of the Muscular Dystrophy Association of Oregon that the court described as "unusually bizarre and mysterious"); *Carter v. Ingalls,* 576 F.Supp. 834, 835 (S.D.Ga. 1983) (in which a district court that had to deal with an inmate's "preposterous" claim under section 1983 that the warden had fabricated "pictures of [the inmate] having sex with a dog" said, "The study of prisons and the *pro se* litigants who inhabit them is like the study of astronomy or even science fiction. The explorer of the world of prisons and *pro se* plaintiffs embarks upon a fantastic voyage into another world, even another galaxy, far, far away.").

Section 1983's development from a statute that was "moribund" for ninety years after its enactment into its present status as the source of substantial part of the federal civil caseload is succinctly traced in *Barnier v. Szentmiklosi,* 565 F.Supp. 869, 872–74 (E.D.Mich.1983). Additional statistics documenting "the swelling tide of § 1983 actions [that] threatens to engulf the federal courts" are cited in *Thurman v. Rose,* 575 F.Supp. 1488, 1491 n. 4 (N.D.Ind.1983).

**5.** Miller & Culp, *Litigation Costs, Delay Prompted the New Rules of Civil Procedure,* Nat'l L.J., Nov. 28, 1983, at 24.

into the labyrinthine byways of small-town politics. The undisputed facts in the record disclose that the roots of this dispute can be traced back to at least May 10, 1982. On that date Ronald Lupo resigned under fire from his position as chief of the Clarendon Hills Police Department. A week later, on the recommendation of the village president, the village board appointed Wayne Linhart, a police sergeant, to serve as acting chief of police until a permanent replacement for Lupo could be found. The board's Police Safety Committee was given the task of searching for a new chief of police.

After his appointment as acting chief, Linhart was interviewed by the board's search committee as an applicant for the permanent position. Arthur Blackwell, a former member of the police department who had retired on a disability pension, was also among the candidates interviewed. When the selection process was finally over, the board's search committee recommended to the village president that Blackwell be given the job as permanent chief. The board's committee provided the president with the name of another man as its second choice. Linhart was not recommended.

On October 18, 1982, the six trustees of the village board unanimously passed a resolution calling on the village president to follow their search committee's recommendation and appoint Blackwell as police chief. The village president, however, had other ideas. While the board's search committee had been conducting a wide-ranging hunt for a permanent chief, advertising for applicants and employing a state agency to screen more than 40 candidates from outside the department, the village president had assembled a clique of three personal "advisors"—including one of Linhart's lawyers in the instant case—to help him select his own man for the job. The village president did not reveal the existence of this hand-picked group to either the public or the board, and the group met in private at the president's home.

Linhart, who according to one trustee was the president's choice for chief of police even before Lupo's departure, was one of only three men interviewed by the president's secret committee. During that interview Linhart was shown a confidential memorandum that village manager Edward Glatfelter had prepared at the request of a member of the board's search committee. This memorandum detailed several incidents of unsatisfactory performance by Linhart as acting chief of police. The village president had obtained this confidential document when the board met in executive session to discuss its recommendation of Blackwell as permanent chief.

Following this interview at which it was made clear to Linhart that Glatfelter thought him unqualified to be permanent chief, Linhart was contacted at his home on the night of October 30, 1982 by Bernard Mulder, a local businessman who was active in Clarendon Hills politics and who had formerly employed Linhart on a part-time basis. At the behest of Mulder, who Linhart knew had a long-standing dissatisfaction with Glatfelter as village manager, Linhart agreed to approach Blackwell and inquire whether Blackwell felt he could serve as village manager rather than chief of police. Immediately after this conversation with Mulder, Linhart telephoned Blackwell and arranged to meet him at the police station that night. When Blackwell arrived at the station at about 10 p.m., Linhart showed him into the chief's office. In accordance with his instructions from Mulder, Linhart then said to Blackwell, "Art, I have been asked to ask you if you could do the job of Village manager." Blackwell responded that he had not applied for the village manager's job but thought himself qualified to fill the position. Blackwell then departed.

The next morning, Linhart reported the results of his inquiry to Mulder. Later that day, after Linhart had reported back to Mulder, the village president telephoned Blackwell and requested him to come to his house at about 3 p.m. the following afternoon. When Blackwell appeared for this meeting, the village president read to him a

statement that he intended to deliver at the village board meeting that evening. In this statement the president publicly disclosed for the first time the existence of his private search committee and declared that Linhart was his appointee for chief of police despite the board's recommendation that Blackwell be given the job. After reading this to Blackwell, the village president said he was dissatisfied with the performance of Glatfelter as village manager and proposed that Blackwell be named to take over Glatfelter's job. When Blackwell protested that he had not applied to be village manager and that the position was not open in any event, the village president said that he and his advisors nevertheless thought Blackwell would make an excellent village manager, and he again importuned Blackwell to consider his offer. Blackwell left without responding.

Before the board meeting that night, Walter Reilly, a trustee who had served on the board's search committee, received a call at his home from Colin Williams, one of Bernard Mulder's friends. Williams inquired whether Reilly agreed with him that it would be good for the village to install Blackwell, the board's unanimous choice for police chief, as village manager instead and to make Linhart the permanent chief of police. Reilly responded that Blackwell had not applied to be village manager and that the job was not open anyway.

At the board meeting the village president delivered his statement rejecting the board's recommendation of Blackwell and nominating Linhart as chief of police. By majority vote, the trustees refused to confirm this nomination, and with the president and trustees at an impasse the village remained without a permanent chief. The best the president could do was to name Linhart to continue as acting chief.

Shortly thereafter, Reilly told Blackwell of the call he had received from Colin Williams just before the board meeting. When Blackwell heard that Williams had

discussed the desirability of appointing him to replace Glatfelter as village manager, Blackwell became upset and related to Reilly that both the village president and Linhart had approached him regarding the same subject. Upon hearing this, Reilly concluded that such a drive to oust Glatfelter and recruit Blackwell as his successor "was a matter of importance to the village [and] was certainly a matter of importance to Mr. Glatfelter in relationship to his management of village activities." Reilly thus advised Blackwell to inform Glatfelter of these events.

When Glatfelter learned from Blackwell that Linhart, who as acting head of the police department was his direct subordinate, had served as a go-between in the initial overture to Blackwell, he questioned Linhart about it during one of their regular daily meetings. Linhart confirmed the accuracy of Blackwell's account of the October 30 meeting at the police station. But when Glatfelter asked Linhart who had put him up to making this approach to Blackwell, Linhart refused to say. As Linhart later testified at his deposition, he felt that Glatfelter "had no business knowing" on whose behalf he had been acting when he inquired whether Blackwell thought he could take over Glatfelter's job.

After talking to Linhart and advising him that a chief of police should "stay out of politics," Glatfelter presented the facts to an executive session of the village board. The trustees all agreed that Linhart's conduct had been inappropriate for a department head, and they recommended that Glatfelter reprimand Linhart in writing. Glatfelter did so on November 17, 1982. Glatfelter subsequently discussed the reprimand with Linhart at Linhart's request, and the letter of reprimand was modified. In the ensuing months, Linhart and his lawyer rejected two offers by the village to further modify the terms of the letter of reprimand.[6] Linhart then filed this lawsuit

---

**6.** The first of these compromise proposals was made by the village's attorney on January 11, 1983. He offered to withdraw the reprimand from Linhart's personnel file as soon as Linhart's temporary assignment ended upon the appointment of a permanent chief of police.

against Glatfelter and the village, charging that Glatfelter had violated his civil rights by issuing the letter of reprimand.

In the spring of 1983, an election was held in the village and the voters turned out the village president who had been backing Linhart for chief of police. The newly elected village president appointed Blackwell as permanent chief and the board gave its unanimous consent. When Blackwell took over, Linhart reverted to his civil service rank of sergeant.

## II.

Linhart complains that Glatfelter deprived him of property without due process of law in violation of the fourteenth amendment. This claim is based on Glatfelter's alleged failure to act in strict conformity with the police department's procedural rules for disciplining officers when he issued the letter of reprimand. For example,

Linhart protests that "no written report summarizing the investigation and describing the incident was prepared" pursuant to police department rule 14.06. (Plaintiff's Motion for Summary Judgment ¶ 12).

There are a host of problems with this due process claim, not the least of which is that Linhart was reprimanded in his capacity as an acting department head and not as a police officer. Given the lines of command in Clarendon Hills village government, where all department heads are under the direct supervision of the village manager, it is doubtful that the village manager was obliged to follow the police department's procedural rules in such circumstances. But even if he was, his departure from those rules was so slight as to be inconsequential. With respect to Linhart's objection about the lack of a written report, for instance, it must be noted that Glatfel-

Linhart's lawyer rejected this proposal the next day. (Defendants' Response to Plaintiff's Request for Admissions, No. 20). A week later, on January 19, the village's attorney contacted Linhart's lawyer again, this time in a letter informing him that the village intended to place a revised version of the letter of reprimand in Linhart's file and inviting Linhart to file a written response to the reprimand.

Linhart's lawyer was told that the revised letter would drop all references to the police department's rules and regulations because "it has always been the intent of the reprimand to comment upon Sgt. Linhart's action solely as to his position as a department head (albeit temporary), rather than his performance as a line police officer." This modification of the letter was not really necessary. There was no ambiguity about the intent of the existing letter; its first sentence declared that Linhart was being reprimanded in his capacity "as Acting Chief of Police." Nevertheless, the village placed the revised letter in Linhart's file on January 20. Like the original version, the revised version set forth Glatfelter's conclusion that Linhart's conduct had been "disloyal and undermining [of] the general principles on which the Village's form of government is based," and it reminded Linhart that "[his] position, of all Village staff positions, must be held above and beyond any question of political interference or obligation."

On February 1, Linhart's lawyer belatedly responded, stating in the first paragraph of a letter to the village's attorney that this "proposed resolution" of Linhart's grievance "have [sic] been rejected by my client." The letter

from this lawyer—who had recently represented Linhart in an overtime pay dispute with the village before Linhart had been named acting chief of police—then went on at some length in a vein that seems remarkable in view of the serious constitutional principles that he purported to be vindicating when he filed this lawsuit three weeks later. Rather than saying a single word about the grievous violations of various constitutional rights that Linhart now complains of, the letter simply demanded that the village pay Linhart an additional $476.25 per month while he served as acting chief of police. When the village refused to capitulate and Linhart filed his federal civil rights action, this petty pay dispute showed up in the complaint as a pendent claim. In fact, this grievance over Linhart's wages, which was grounded entirely on state law, made up the bulk of his federal complaint. Three of Linhart's four counts dealt with this matter while his federal civil rights claims, which consisted of nothing more than a handful of conclusory allegations, were lumped together in a single perfunctorily drafted count like poor relations. There is considerable force to the defendants' argument that "[t]he circumstances strongly suggest that this suit was conceived of not as a vehicle for vindicating any violation of plaintiff's constitutional rights, but rather as a club to use in pressing his demand for more pay." (Defendants' Answer to Plaintiff's Motion for Summary Judgment at 4). This is unfortunate because, like the district court in *Renfroe*, note 4, *supra*, this court is·"sensitive to claims brought under the guise of constitutional deprivations, which are in reality premised on a non-constitutional basis." 549 F.Supp. at 1370.

ter provided a detailed description of the facts underlying the reprimand in the body of the letter itself. Linhart has pointed to nothing in the rules which says that the facts must be set forth in a separate document. Moreover, it is noteworthy that Linhart does not complain that the facts as stated by Glatfelter are inaccurate in any material respect. Rather, Linhart's quarrel is with Glatfelter's conclusion that those facts warranted a letter of reprimand. The rules, however, do not circum-

**7.** The police department rules expressly provide that the *"[e]xistence of facts* establishing a violation of law, rules or regulations, general or special orders, policies or procedures, written or verbal orders *is all that is necessary as a basis for departmental discipline."* (Village of Clarendon Hills Department of Police Rules and Regulations, Preface (emphasis added); unmarked exhibit appended to Plaintiff's Motion for Summary Judgment).

**8.** In paragraph 6 of his motion for summary judgment, Linhart says, "Defendant Glatfelter admits that if Plaintiff was charged in his capacity as Sergeant he would be entitled to a hearing, pursuant to the provisions of the Rules and Regulations, however he is not entitled to a hearing when he is charged with identical violations in his capacity as Chief of Police. The Rules and Regulations however make no such distinction." Linhart then cites pages 152–56 of the transcript of Glatfelter's deposition. This portion of the transcript, however, does not establish that Linhart had a right to a hearing before being reprimanded. All that is clear is that Glatfelter was perhaps somewhat confused by a series of opaque questions put to him by Linhart's lawyer. The following colloquy is illustrative of the problem:

Q. At no time did Sgt. Linhart receive a notice of the right to hearing before the Fire and Police Commission, did he?

A. That is correct.

Q. At no time was he informed in writing of the disciplinary action and right to hearing guaranteed in Section 24–10.1–17?

A. That is correct.

MR. BROOKS [the village's attorney]: Are you familiar with that statute?

THE WITNESS: No, I am not.

By MR. EKL:

Q. Is it your position, sir, that you can discipline Sgt. Linhart by way of a written reprimand without affording him the right to a hearing?

A. For duties which he performed as a department head; yes.

MR. BROOKS: Are you referring, counsel, to the hearing and decision in the sections you just relied upon, the Police and Fire Code

scribe Glatfelter's authority to reach such a conclusion. In other words, once the facts were established—in this case through Linhart's admission that Blackwell had accurately described their meeting—Glatfelter was free to decide that Linhart had behaved improperly and deserved a reprimand.[7] It does not appear that Linhart was entitled to a hearing before such mild discipline was meted out.[8] Nor does it appear that Linhart had any right of ap-

or Board of Police and Fire Commission or any hearing?

MR. EKL: I am referring to pursuant to the provisions of either the Rules and Regulations of the Clarendon Hills Police Department, the Rules and Regulations of the Police and Fire Commission and State law taking into consideration those three sources that you have the right to issue a written written [sic] reprimand and issue disciplinary action against Sgt. Linhart if he is fulfilling the role of an acting chief and therefore department head? (Glatfelter dep. at 152–53).

It is difficult to see how anyone could comprehend this last statement, much less formulate a meaningful response to it. But in any event, it makes no difference whether Glatfelter thought that Linhart had a right to a hearing in certain circumstances before receiving a letter of reprimand. What matters is whether there was any law or regulation providing such a right, and Linhart has pointed to no such authority. Ill.Rev.Stat. ch. 24, § 10–1–17, which Linhart's lawyer cited to Glatfelter, certainly provides no right to a hearing on any subject; it has nothing to do with discipline. The following section, 10–1–18, does deal with discipline. However, it applies only in cases where the penalty is discharge or suspension, and it makes no reference to mere reprimands. The same is true of section 10–2.1–17, which is the only other statutory authority to which Linhart's lawyer might have been referring. This should come as no surprise to Linhart's lawyer. If he had read page 3 of this court's June 15, 1983 opinion before deposing Glatfelter in August, he would have learned that "[e]ven a cursory reading of [section 10–2.1–17] reveals that it is limited by its own terms to discharges and suspensions." And if he had read *Confederation of Police v. City of Chicago*, 547 F.2d 375 (7th Cir.1977), which this court cited on the same page, he would have discovered that no other state statute protects police officers "from adverse action short of discharge or suspension." Nor is there anything in the police department's rules or the rules and regulations of the Board of Fire and Police Commissioners that provides for a hearing in cases where an officer is merely reprimanded by his superior rather than discharged or suspended.

peal.[9] And even if he did have a right to appeal to the village board or the Board of Fire and Police Commissioners, he did not avail himself of that right. Instead, Linhart merely asked for and was granted a meeting with Glatfelter to discuss the basis for the reprimand. He never demanded a public hearing before any governmental body.[10]

Aside from the fact that the alleged procedural errors in the issuance of the letter of reprimand are insubstantial in the first instance, a more fundamental difficulty in Linhart's position is his inability to identify any substantive interest that has been impaired by Glatfelter's action. This court previously declined to dismiss this claim because it was not clear on the sparse record then available that Linhart could not prove that he had been deprived of some interest entitled to due process protection. Now that discovery has been completed the lack of such proof is manifest.

Linhart has disclaimed any contention that he had a property or liberty interest in the police department procedural rules themselves (Plaintiff's Answer to Defendants' Motion for Summary Judgment at 4). *See Olim v. Wakinekona,* 461 U.S. 238, ————, 103 S.Ct. 1741, 1747–48, 75 L.Ed.2d 813 (1983); *McKinney v. George,* 726 F.2d 1183, 1190 (7th Cir.1984); *Hadley v. County of Du Page,* 715 F.2d 1238, 1244 (7th Cir.1983); *Lyznicki v. Board of Education,* 707 F.2d 949, 952 (7th Cir.1983); *Shango v. Jurich,* 681 F.2d 1091, 1100–01 (7th Cir.1982); *Endicott v. Huddleston,* 644 F.2d 1208, 1214 (7th Cir.1980); *Goodisman v. Lytle,* 724 F.2d 818, 820–21 (9th Cir.1984); *BAM Historic District Association v. Koch,* 723 F.2d 233, 236–37 (2d Cir.1983); *Loudermill v. Cleveland Board of Education,* 721 F.2d 550, 563 (6th Cir.

1983). *See also Hughes v. Whitmer,* 714 F.2d 1407, 1417 n. 8 (8th Cir.1983) ("Without an identifiable fourteenth amendment liberty or property interest, a federal court has no jurisdiction under 42 U.S.C. § 1983 to enforce state employee procedural rights that are created by state law."). He also concedes that he had no property interest in remaining the acting chief of police or in being appointed to serve as chief on a permanent basis. Although his briefs are less than clear on the point, it appears that he is asserting that the letter of reprimand had some adverse impact on his employment as a police sergeant. If that is indeed Linhart's contention, it is belied by the undisputed facts in the record. By its own terms, the reprimand was directed at Linhart's conduct as chief of police, an office in which he was responsible for an entire branch of village government. It did not reflect on his ability to perform his regular duties as a sergeant. And once Linhart resumed his normal position upon Blackwell's appointment as permanent chief, he was allowed to take up his regular duties without substantial change. Nobody threatened to fire or suspend him. He was not demoted. Nor did he suffer any cut in pay or loss of seniority. In short, once his days as acting chief finally came to an end in the normal course of village affairs, he went back to being a sergeant just as he had been for years. The letter of reprimand he had received while serving as chief did not affect his position in any way and would have been removed from his personnel file at that time had he not insisted that it remain there while he prosecuted this lawsuit.

■ There has been no deprivation of property or any other substantive interest

---

**9.** Linhart has failed to cite any authority showing that he had a right to appeal from the issuance of a letter of reprimand. Police department rule 14.08 provides:

> Any sworn member of the Department may appeal disciplinary actions taken against them in accordance with the applicable State statutes as well as the Rules and Regulations of the Board of Fire & Police Commission governing same.

But this does not help Linhart because both state law and the commission's rules provide for appeals only from suspensions, not reprimands.

**10.** Linhart not only failed to demand a hearing, but he also failed to take up the village board on its offer to give him a hearing on his reprimand in an effort to avoid litigation. (Defendant's Answer to Plaintiff's Motion for Summary Judgment at 3 n. 2).

in this case. Therefore, Linhart was not entitled to procedural due process when Glatfelter reprimanded him. But even if it were to be accepted for the sake of argument that Linhart did have a constitutional right to some process under the facts of this case, that right was adequately protected by the procedure Glatfelter employed. Accordingly, the defendants' motion for summary judgment on this claim is granted and Linhart's cross-motion for summary judgment is denied.

### III.

Linhart's remaining claim is based on the first amendment. He contends that Glatfelter's letter of reprimand impermissibly penalized him for the exercise of his right of free speech. In analyzing this claim, the first step is to determine whether Linhart's speech was constitutionally protected. *See, e.g., Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). *See also Bowman v. Pulaski County Special School District,* 723 F.2d 640, 643–44 (8th Cir.1983) (explaining the three step analysis used in deciding a claim by a public employee that his first amendment rights have been violated). As it happens, that is also the last step in this particular case. There is no need to decide whether Linhart's speech was the motivating factor in Glatfelter's decision to write the letter of reprimand. *See, e.g., McGill v. Board of Education,* 602 F.2d 774, 779–80 (7th Cir.1979) (correct standard is whether protected speech was the "motivating factor" for the adverse action). That factual question of motive is not in issue. Glatfelter admits, and the letter states on its face, that it was written as the result of Linhart's meeting and conversation with Blackwell. Similarly, there is no need to decide whether the reprimand would have been issued anyway, even if Linhart had not met with Blackwell as he did. *See, e.g., Mt. Healthy Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (employer prevails upon proving that same action would have been taken in absence of the protect-

ed conduct by the employee). That defense, which often involves subtle factual issues of motive and intent, is not raised in this case. The only question, therefore, is whether Linhart's speech was protected. If it was not, the letter of reprimand cannot support a constitutional claim; if it was, the letter infringed Linhart's right of free speech.

██ The inquiry into the protected status of Linhart's speech is one of law, not fact, *e.g., Connick, supra,* at 1690 n. 7, and it has two stages. First, the court must determine whether Linhart was speaking out as a citizen upon a matter of public concern when he met with Blackwell and asked him if he felt capable of assuming Glatfelter's duties. If this conduct cannot be fairly characterized as constituting speech on a matter of public concern, that is the end of the inquiry and it is unnecessary to scrutinize Glatfelter's justification for writing the letter of reprimand. *See, e.g., Connick,* at 1689; *Ekanem v. The Health and Hospital Corp.,* 724 F.2d 563, 571 (7th Cir.1983). Second, if it is determined that Linhart's speech did touch upon a matter of public concern, the court must decide whether under the particular facts of this case Linhart's interest, as a citizen, in commenting upon such a matter outweighed the village's interest, as an employer, in the effective and efficient fulfillment of its responsibilities to the public. This is the *Pickering* balancing test, and where the interests of the governmental employer outweigh the interests of the employee, adverse personnel action based on the employee's speech does not offend the first amendment. *See, e.g., Connick; Pickering, supra; Egger v. Phillips,* 710 F.2d 292 (7th Cir.1983) (en banc), *cert. denied,* —— U.S. ——, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983).

The Supreme Court recently held that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form and context of a given statement, as revealed by the whole record." *Connick, supra,* at 1690.

When the record in this case is reviewed under that standard, it is clear that Linhart's speech to Blackwell during their late night meeting at the police station did not touch upon a matter of public concern. Aside from a scattering of nebulous references to public concern[11]—which only came out very late in the game as Linhart responded to discovery in anticipation of the parties' motions for summary judgment, *see Renfroe v. Kirkpatrick*, 722 F.2d 714, 715 (11th Cir.1984) (where a last-minute reference to a subject of public concern was held insufficient to transform an otherwise personal grievance into speech touching upon a matter of public concern)—Linhart has presented no specific facts whatever showing that he was animated by a sense of public duty or interest when he arranged his clandestine meeting with Blackwell. Specific facts, though, are what Linhart needs to withstand a motion for summary judgment. Nothing less will do, particularly not bald assertions of the general truth of a particular matter. *Korf v. Ball State University*, 726 F.2d 1222, 1226–29 (7th Cir.1984); *Hadley v. County of Du Page, supra*, at 1243; *Posey v. Skyline Corp.*, 702 F.2d 102, 105–06 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). It thus does Linhart no good to glibly mouth the words "public concern" as if they were an incantation which when uttered on cue in conjunction with Glatfelter's name transformed Linhart's every thought of the man into a matter of constitutional significance.

The only specific evidence on this subject that does exist in the record, most of it from Linhart's own lips, shows that Linhart's concern was narrow and parochial. At his deposition, Linhart candidly admitted that his thoughts regarding Glatfelter's performance were his own "personal opinion and concern," which he had never publicly expressed. (Linhart dep. at 105). This concession that his opinion of Glatfelter's work was entirely personal knocks the props out from under the assertion that Linhart felt his differences with Glatfelter represented a matter of public concern. And if that were not enough, Linhart has gone further and admitted that he cannot even say that he was thinking of his personal assessment of Glatfelter when he talked to Blackwell. When asked if "part of what was in [his] mind" when he met with Blackwell was his opinion that Glatfelter "could put out a better effort on the job," Linhart responded, "I honestly don't know." (*Id.* at 102). Moreover, it is clear that Linhart did not approach Blackwell because he thought Blackwell could do a better job for the public than Glatfelter.

---

**11.** The thinness of Linhart's contention that he thought he was speaking on a matter of public concern is revealed in the very testimony in which he attempted to describe the nature of this "public concern." The following exchange is representative:

Q. Wasn't your inquiry to Arthur Blackwell really a case of your own personal interest, more than one of public concern?

A. No, because that concerned the Village, and like I said before, I honestly didn't think that Art would, you know, be qualified for it, but, you know, maybe someone was.

I don't know, the Village manager, like I said, I wasn't quite content with the way he was going [sic] things. I actually felt that it was a public concern.

Q. But you never raised it in any kind of public form, I take it?

A. Well, working for the police department, you have to try to watch that, you know, you just don't go into conversations with people.

Q. Why wouldn't you discuss that with men in your department, if you felt it was a matter of public concern?

It would affect them, would it not?

A. Well, there is always moaning and groaning in every department but still, when you make a stand and you say yes, you should replace this man or this is what should be done, it always will get out. I don't care how you look at it.

Q. So what?

A. Look what happened here.

. . . .

Q. You said that you asked [Blackwell] because Bernard Mulder asked you to ask him and you said you asked him because you, yourself, had concerns about the Village manager performing his duties.

A. I didn't say that is the reason I asked him. I did have this in my mind. That wasn't the motivation for everything.

It is just that—yes, I was concerned, for the Village and whatever.

(Linhart dep. 108–09, 111).

Linhart has stated that he did not think Blackwell "had the education or the experience" to do Glatfelter's job. (*Id.* at 82).

The record demonstrates beyond question that in speaking to Blackwell, Linhart did not seek to inform the public that Glatfelter was not discharging his official responsibilities in managing the village's business. Nor did Linhart seek to bring to light actual or potential wrongdoing or breach of public trust on the part of Glatfelter. Linhart admits he did not think Glatfelter was guilty of such conduct. Instead, based on Linhart's own description of his actions, his role in the affair was not to express any views of his own but simply to serve as a lackey for Bernard Mulder. When Mulder called, Linhart jumped to do his bidding, setting up a meeting with Blackwell that very night. And as Linhart readily concedes, he "never really thought about" the question Mulder instructed him to put to Blackwell; he just did as he "was asked." (*Id.* at 101). Then, after carrying out his assignment, Linhart dutifully reported back to Mulder.

The undisputed evidence leads ineluctably to the conclusion that no matter of public concern was involved here. Except for a handful of isolated instances over the years when individual trustees or other functionaries were displeased by Glatfelter's handling of a particular matter, there was no widespread general dissatisfaction with his performance. And there was certainly no public outcry for his removal. The village was not seeking to replace Glatfelter, and the evidence shows that aside from a few individuals with personal axes to grind, such as Mulder and the village president, the public generally supported Glatfelter. Thus, it can hardly be said that the public was concerned with Blackwell's ability to step in and fill Glatfelter's shoes in the event the village president and his cronies could find a way to boot Glatfelter out of office. Blackwell was at that time the board's unanimous choice to fill the vacancy existing in the office of chief of police. He had not applied to be village manager and was not interested in the job even had it been open. Under these circumstances, while the public obviously was concerned with Blackwell's ability to head the police department, it was just as obviously not the least concerned with whether Blackwell thought himself qualified to be village manager.

■ When Linhart put Mulder's question to Blackwell, he was speaking on a matter of only private interest, not one of public concern. Accordingly, the defendants are entitled to summary judgment on this claim.

■ Even if Linhart's speech might somehow be characterized as touching upon a matter of public concern, summary judgment for the defendants is still appropriate on the alternative ground that Linhart's interest in speaking was outweighed under the facts of this case by the village's interest in rendering efficient public service. Linhart's interest in the speech at issue was tenuous at best. For one thing, he was not expressing his own view on anything, but was merely serving as a complaisant intermediary through whom Bernard Mulder could approach Blackwell and pose a sensitive personal question heavily laden with partisan implications. Assuming the dubious proposition that Mulder's question touched upon some matter of public concern, the contact was barely palpable since the only public concern that can fairly be said to have been implicated under the circumstances is the public's general interest in the fact that Glatfelter was an important public official whom the village president and a small band of his adherents were attempting to subvert. *See Egger, supra,* at 316–17 ("In assessing whether the speech touches upon a matter of public concern, it is important not to equate the public's curiosity about a matter with a matter having societal ramifications. People may be interested in any number of aspects of the lives of public officials and employees, but that does not mean that such matters have societal ramifications.").

In addition to the fact that Linhart's speech touched upon a matter of public concern only in the most limited sense, if at all, the time, place, and manner of the speech also weighs against Linhart in the

*Pickering* balance. Based on the undisputed facts in the record, there can be no doubt that Linhart's meeting with Blackwell was the opening salvo in a campaign to deflect Blackwell from his bid to become chief of police in order that Blackwell could be advanced as a replacement for Glatfelter, a move which not coincidentally would pave the way for Linhart to be installed as chief. Blackwell sensed that he was being manipulated as this intrigue unfolded and he became angry. Linhart could not reasonably have believed that his part in these machinations would remain secret for long. And, as things developed, word quickly got back to Glatfelter.

That Linhart met with Blackwell in the chief's office at the police station exacerbates the situation, ·and so does the fact that as a rival candidate for the permanent appointment Linhart had an obvious personal stake in seeing Blackwell join in an effort to overthrow Glatfelter. Blackwell, Glatfelter, and the public easily could have perceived Linhart as using his public office to gain a personal objective.[12]

In contrast to Linhart's minuscule interest, the village's interest, as an employer, was significant. Under the form of government employed in Clarendon Hills, Glatfelter is the village's chief administrative officer. As head of the police department, Linhart reported directly to him, and it was vital to the effective functioning of village government that the two maintain a close and personal working relationship. In view of the sensitive concerns inherent in the police department's business, the relationship between the police chief and the village manager is one that calls for a particularly high degree of loyalty and confidence. It takes no unusual insight to see that the repercussions of a breakdown in that relationship could be far more damaging to the public interest than, for example, a falling-out between the village manager and the head of ·the street department. The close working relationship between Linhart and Glatfelter is exemplified by the fact that they had a regularly scheduled meeting every day to confer about police business. *See Egger, supra,* at 319 ("Harmony is particularly required among employees who frequently are required to work on joint projects and the importance of avoiding disharmony among such workers is particularly acute in certain types of endeavors.").

This close relationship, reliant upon mutual trust and confidence, was seriously damaged when Glatfelter learned of Linhart's rendezvous with Blackwell. As Glatfelter put it,

> I was upset by the fact that there was a move afoot to replace me ... and that one of my own employees was intimately involved in that.
>
> . . . .
>
> I think I was mostly concerned that a Village employee, especially an acting de-

---

**12.** As evidenced by the following excerpts from his deposition testimony, Glatfelter did form such a perception of Linhart's activities:

> Q. Would you explain to me, sir, how Sgt. Linhart utilized his official position for political purposes?
>
> A. The fact this consideration [conversation] took place in his office, that he specifically requested Blackwell to meet him in his office.
>
> I have the feeling that he was using his, I felt it is like you set a general stage with the time of this event occurring. He was using the office of the Chief of Police, the facility of the office, the trappings of the office, if you will, to ask that question.
>
> If he had asked that question in his own home or out on a fishing trip or anywhere else but he used the office of the Chief of Police where he was the acting Chief of Police to ask that question.

> . . . .
>
> Q. So it is your opinion, it was your opinion that by Linhart asking Blackwell a question as to whether he was capable of performing the job of Village Manager that he was using his position of Chief of Police to secure a political advantage for himself?
>
> A. By doing it within his office; that is correct.
>
> . . . .
>
> THE WITNESS: The thing that concerns me again is the involvement of the office, that statement he asked Art Blackwell, given the context of other things going on in the Village, was clearly political.
>
> To have it occur in the Chief's office by the Chief is, I think, unacceptable and is in fact using the office for political purposes, political utilization of the office of Chief of Police.

(Glatfelter dep. at 141–44).

partment head, became involved in what I would call the politics of the Village at the time.

. . . .

I have difficulty with that because I have a very strong personal bias that professional department heads should not at all be involved in that kind of activity[.] . . . [N]o department head of the Village should have been participating in that kind of activity.

(Glatfelter dep. at 113, 116).[13] At his deposition, Linhart acknowledged that he knew his communication with Blackwell would likely harm his working relationship with Glatfelter if Glatfelter found out about it:

Q. Well, were you concerned that it would affect your working relationship with the Village manager?

A. If I made a statement to that, yes, definitely. That is why I did it in confidence, trying to be a little—

. . . .

Q. You do agree, I take it, that if the Village manager learned you had made that inquiry, his knowledge of your inquiry would have upset your working relationship with him, isn't that correct?

A. Very possible.

. . . .

Q. Well, why were you concerned that the inquiry get back to the Village manager of Clarendon Hills in particular?

A. I don't remember saying of—well, possibly, because it would put a poor working relationship between the two of us.

(Linhart dep. at 109, 113, 118).

"When close working relationships are essential to fulfilling public responsibilities,

a wide degree of deference to the employer's judgment is appropriate." *Connick, supra,* at 1692. Considering Linhart's extremely limited first amendment interest, this case is one in which it is especially proper to give great deference to Glatfelter's judgment. Glatfelter was not constitutionally required to sit by without saying a word when the acting chief of police threw in his lot with a cabal that was scheming to throw him out of office. The letter of reprimand Glatfelter issued stating that Linhart's conduct was improper therefore did not offend the first amendment.

IV.

For the foregoing reasons, the defendants' motion for summary judgment is granted, and Linhart's cross-motion for summary judgment is denied.

---

**13.** Glatfelter further explained the deleterious impact of Linhart's conduct on their working relationship as follows:

Q. Did you find a relationship between the statement that Linhart made to Blackwell and his performance of his responsibilities as Chief of Police?

A. Yes, I did.

Q. What was that relationship?

A. I feel that relationship goes to his whole ability to perform in that job and his ability to work with me in that job.

The fact that I was the duly appointed Village Manager, was supported by the majority of the Village Board and that by his asking those questions as the acting chief, as one of my department heads, he was indicating, I think, a preference for or at least a role in someone's desire to have someone other than me in that position and I am in fact his direct supervisor, so I feel the question does relate very clearly to his responsibilities and roles as Chief of Police.

(*Id.* at 139–40).